The next case on our call is agenda number six, number 129627. People of the State of Illinois v. Maciel Ward. Counsel for the appellant, are you prepared to proceed? Thank you, Your Honor. I may please the court. I'm Assistant Attorney General Eric Levin on behalf of the people of the State of Illinois. In January 2013, defendant opened fire at a group of high school students in a park, killing 15-year-old Hedaya Pendleton and wounding two of her classmates, Lawrence Sellers and Sebastian Moore. The jury found defendant guilty of first-degree murder and two counts of aggravated battery with a firearm, and the appellate court should have affirmed those convictions on appeal. Instead, the appellate court held that the trial court erred in denying defendant's motion to suppress his confession to police, and that that error necessitated a new trial. But the appellate court made three errors of its own that this court should address and correct. May I start right at the beginning, Mr. Levin? Yes. What are we doing here? It seems to me before we discuss the heartbreaking case or the importance of Fifth Amendment constitutional protections, we have to think about appellate practice and Supreme Court rules. In other words, we have to know we're going to write an opinion here. In order to write an opinion, we have to say the issue in this case is. How do we frame the issue? And we determine how to frame the issue because of our understanding of how the Supreme Court rules work and how appellate practice works. Now, it's very clear that the appeal here in the appellate court was presented by the Cook County State's attorney. They also presented the petition for leave to appeal to this court. And then the attorney general becomes involved. I think you have acknowledged throughout your brief that the position of the State has, shall we say, evolved significantly than what it was in the appellate court. So where are we? What are we talking about? And so my concerns are things like this. We are here pursuant to Supreme Court Rule 315, which sets out the grounds for a petition for leave to appeal. In other words, this court only has discretionary authority to choose which cases to take based on what is presented to it as to what the issues are going to be that this court needs to answer. In fact, 315 sets it out, the character of reasons which will be considered and to identify in the question presented. All right. From my understanding, there are two issues that were identified in the petition for leave to appeal that we reviewed and we voted to take. The first one was that the appellate court erred in the application of the standard of review in this matter. Now, my understanding is that you have conceded that the court itself was appropriate in its application of the standard of review. Secondly, the notice of appeal raised issue of whether or not any constitutional violation was harmless, in the sense that there was so much evidence in this case that whether or not there was or if there was in fact a violation, that in fact the conviction should stand. We know that in the appellate court, this argument was not raised in any of the initial briefs until there was a supplemental brief filed by the State two days before oral argument, the first time this issue was raised. In the appellate court, the court's opinion noted this forfeiture, this clear violation of appellate practice of raising an issue in that manner. However, the court went ahead and addressed the issue of harmlessness. The court discussed what the argument was being made by the State, and I would think you'd probably agree, the argument that was made before the appellate court, even though it had been forfeited, the court entertained it, and it was a completely different argument than what you're making here. Finally, nothing in the petition of the legal appeal mentions any violation of the Fifth Amendment. The appellate court is very clear in its opinion that the State does not even suggest in its brief that the police officers conspicuously honored the invocation of the Fifth Amendment. That wasn't even raised at all in the appellate court. It certainly isn't mentioned in the PLA. We have to write an opinion. You have to tell us what is the issue here in this case. Of course, let me make clear. I'm raising these issues because there was a motion that was filed here to dismiss this case as improperly granted. This court denied that, and now this is an opportunity for a full-blown hearing on that. How did we get here? Well, Your Honor, I think you're correct in what you've described, but I would push back a little bit. We did, as you know, we did raise in the PLA two issues, the standard of review question and then separately the harmless error question. Your Honor is correct to note that we did not timely raise that in the appellate court, and the appellate court did note that it was forfeited. The appellate court, however, looked past the forfeiture and did address that issue on the merits. Right. And so the argument that was made about that was there was analysis of the closing argument, but it was not an analysis of the evidence itself, and the appellate court rejected the argument that was made at the late date. You're making a completely different argument here. Well, it's true. I mean, we've obviously fleshed out the argument, but I mean, I think it's this Court's practice to hold that issues can be forfeited, not arguments themselves. And so we, you know, we did make the harmless error argument or issue, excuse me, in the PLA, which this Court granted, and that now is properly before this Court. We fully acknowledge that the standard of review question, while important, was not outcome determinative here, and that we recognize that the Court generally does not answer questions like that. We think that it's such an important and recurring question that the Court should. How do we? You talk about it being moot. I don't understand what mootness has to do with this. Usually we talk about mootness as if there's an issue, and time has passed, and no relief can be given to someone. Here, you agree there was no error. How do we write an opinion saying in some other case maybe there'd be error? Well, Your Honor, I think you're right that mootness is probably not the right word. I think it's probably more precise to just talk about it as a question that's not outcome determinative and that the Court generally wouldn't answer. And if the Court, we completely acknowledge that. If the Court doesn't think that this is the case to answer that question, I think what the Court should do is recognize that there's the harmless error question presented and that the appellate court erred in essentially applying what, I mean, I think what you could call it a rule of near automatic reversal, which is contrary to United States Supreme Court precedent and this Court's precedent, which holds that when evidence is improperly admitted at trial, even a confession, a conviction should still be affirmed if it's clear beyond a reasonable doubt that a rational jury would have convicted the defendant absent that evidence. And this Court most recently explained in the People v. Salomon case, which I would note is a case where this Court upheld the conviction despite finding that the confession had been erroneously admitted. And the Court explained that when conducting that harmless error inquiry, the Court should really look at three things. First, did the other evidence in the case overwhelmingly establish the defendant's guilt? Second, was the erroneously admitted evidence cumulative or duplicative of other properly admitted evidence? And finally, is there anything else in the record that shows that the erroneously admitted evidence contributed to the conviction? And here, just as in Salomon, these factors point inescapably to the conclusion that any error in the admission of defendant's confession to police was harmless. I'd like to start with the other evidence in the case, independent of the confession to police, which here, again, I think, you know, overwhelmingly established the defendant's guilt. We have, of course, the jury heard testimony, which defendant has not challenged the admissibility of this testimony on appeal, that defendant made multiple confessions to multiple friends in the hours and days after the shooting. Just 15 minutes after the shooting, when he was in the car with Kenneth Williams and Ernest Tucker and Ernest Finner and Demetrius Tucker, and Williams said that they had just done a, quote, drill, meaning a shooting, and explained that they had been looking for, or they had seen rival 4-6 terror gang members in the park, and that defendant had done the shooting because Williams feared that he would be recognized, the defendant tacitly adopted those admissions by not, by not disputing them, but by angrily telling Williams to stop talking. In the next several days, defendant explicitly confessed to a different friend, Jared Randolph, first in a phone call when he told Randolph that a girl had got killed in 4-6 territory, and explained how he and Williams had, quote, went through, and he had, quote, popped out, which Randolph explained, you know, meant jumped out of the car shooting. In a subsequent phone call, he told Randolph how he felt bogus about the shooting and wished he hadn't done it. Several days after that, at a game meeting, he told Finner, he complained to Finner that Williams was trying to throw him under the bus, even though Williams had pointed out the victims to him. Now, the trial court, or the appellate court, excuse me, recognized that this testimony directly tied defendant to these crimes, but it discounted that testimony because these witnesses recanted their grand jury testimony at trial. But the recantations are simply not credible, and no reasonable jury in these circumstances would have accepted the recantations and discredited the grand jury itself. As the appellate court itself recognized, Finner, Tucker, and Randolph had a strong motive to not testify in open court against a friend and fellow game member, and that motive is evident in the nature of the trial testimony. Finner himself implausibly claimed that he didn't even remember testifying before the grand jury, and I think if you look at the transcript, you'll see about 20 to 30 pages where he simply answered, I don't know, to every question he was asked about his grand jury testimony. Tucker made the equally implausible claim that after he and Finner got in the car with Williams and defendant, that nobody said a word, that they just sat silently. Again, the appellate court recognized that Finner and Tucker, in particular, their grand jury testimony was partially corroborated by surveillance footage, and I would note also by cell site location data. So again, considering all those circumstances, no reasonable jury would have discredited that grand jury testimony, which, as I say, was three separate confessions. There was also very powerful circumstantial evidence, which tied defendant not only to the getaway car, but that placed him in the very seat of that car that a witness saw the gunman enter after the shooting. Ronald Evans, who lived across the street from Harsh Park, testified that he heard gunshots at 215 in the afternoon and looked out the window and saw a man with a gun wearing a blue hooded sweatshirt get into the front passenger seat of a white Nissan Sentra that then fled north. That is the exact make, model, and color of the car that defendant's mother owned. Defendant was driving that car 10 days later when he was arrested. He was wearing a blue hooded sweatshirt at the time. And that's the very car that Finner and Tucker said they saw defendant and Williams in at 229 p.m., just 15 minutes after the shooting. And both Finner and Tucker testified before the grand jury that Williams was driving and defendant was in the front passenger seat of that car. Five minutes before that at 219, so just four minutes after the shooting, Williams' cell phone pinged off of a tower that provided coverage to Harsh Park, so showing that Williams, and by extension defendant who we know is in the car with him five minutes later, were within the vicinity of the crime scene. There's further surveillance footage from about five minutes after that testified that he saw, or the grand jury testified, that he saw defendant in the front passenger seat of that white car. And then at 240 p.m., approximately 25 minutes after the shooting, there's the surveillance footage in front of a residential building at 39th and Lake Park, where we see two men getting out of the car and walking away, and one man getting out of the front passenger seat, walking around to the driver's seat and driving away. And Finner and Tucker, I believe, in front of the grand jury, or in statements, identified defendant as the man who got out of the passenger seat into the driver's seat and drive away, which, you know, is explained by the fact that it's his mother's car, and ultimately when everybody else leaves, he has to get in the driver's seat and drive away. In addition to these other confessions I've discussed, in addition to that circumstantial evidence, we have eyewitness testimony. One of the students in the park, Stephen Abdul, identified defendant in court as the shooter, said he was 100% certain. The jury heard testimony of the five other students in the park that day. Although they didn't identify defendant at trial, they did view lineups and photo arrays shortly after the shooting and described defendant as looking similar to the shooter. They weren't able to say with 100% certainty, but the fact that here we have six people independently identifying or describing the same person as at least looking like the shooter is another piece of the puzzle that, when viewed collectively, overwhelmingly establishes guilt. The second factor that the settlement court said a reviewing court should look at when doing a harmless error analysis is, was the erroneously admitted confession cumulative? And here, just as in settlement, it was. As I say, we have three confessions, no doubt, are powerful evidence. We completely agree with that. But that cuts both ways here because, as I say, the jury heard equally powerful confessions that the defendant made to his friends. In the confession to police, defendant explained that he and Williams saw who they thought were rival gang members in the park, who had recently killed one of their friends, and that Williams gave defendant the gun and threatened to kill him if he didn't do the shooting. And the defendant then got out of the car, fired multiple shots into the park, and ran back. All of that same information was provided to Finner, Tucker, and Randolph in the confessions that defendant made to them and in the tacit admissions, which she adopted from Williams' statement. In all of those statements, the jury heard how the two of these men saw who they thought were four sixth gang members in the park and that defendant was the one who did the shooting and that defendant, quote, popped out, jumped out of the car, and that Williams was the one who pointed out the victims to them. There was also independent testimony from the gang expert who explains the gang retaliation motive, sort of the rivalry, the war that was going on between these two gangs. So all of the evidence that defendant provided to the detectives in the custodial confession came in separately through other testimony. And in those circumstances, and again, as we did argue below, the fact that the confessions were not sort of the central or the custodial confession was not sort of the central piece of the case is evident from the closing argument. The people spent four out of 32 pages of the closing argument discussing the custodial confession, and even on those four pages, about half were discussing an earlier false alibi that the defendant made, not the actual confession itself. So understanding, looking at all these factors together, it's clear beyond a reasonable doubt here that a rational jury would have still convicted the defendant of these offenses even without the custodial confession. And in those circumstances, this Court's precedent and the United States Supreme Court precedent mandates that the conviction be affirmed. And so we think it is important, again, we raised this argument in our PLA. It was an argument that was addressed and considered by the appellate court despite us raising it late. And we think it's important here that this Court also address that question and make clear that while confessions are powerful evidence and while it is true that they will rarely be harmless, there are circumstances where they will be held harmless, and in particular, those circumstances occur where you have other confessions that essentially duplicate the erroneously admitted confession. So we think it's important for the Court to address that question, reverse the appellate court's judgment, and send the case back to the appellate court to address the other claims that the defendant raised. I understand that the Court is probably reluctant to weigh in on some of the other issues we've raised, which we think are important questions, and I'm happy to answer any questions about those issues. But again, our case here for ultimately reversing the appellate court's judgment would depend on the Court addressing those issues or agreeing with us on those issues. And so if there are no further questions, we would ask the Court respectfully to reverse the appellate court's judgment and reinstate defendant's convictions, and as I said, send the case back to the appellate court to consider the additional issues that the defendant has raised. Thank you, Mr. Lewin. Counsel to the appellant. Thank you, Your Honor. My name is Stephen Richards, and I represent the appellee in this case, Nicole Meikle-Warp. Your Honor, my initial plan before I began this argument, which I think I will adhere to, is not to address the issue of whether the petitioner has granted or any of my waiver arguments. I'm not abandoning them whatsoever, and if there's questions on them, I will answer those questions, and I will certainly reassert them. But I am aware that this Court, which has particular and peculiar power in the Illinois system, can ignore questions of waiver, forfeiture, or non-profit grant, and reach the merits of any issue that Your Honors choose. So, on the assumption, which I hope is incorrect, that you are going to reach the merits of these issues, I will address them. And since there was really no discussion of the Fifth Amendment issue itself, let me just first deal with the harmless error issue, and then go backwards. First of all, as to the harmless error issue, the only case cited for harmless error by the appellant was the Salomon case, which is a recent case. And the facts were not discussed at Salomon, were not discussed in the appellant's brief, and I believe they were not accurately recounted just now when the case was mentioned. In Salomon, you have a situation where there's a statement admitted, but the defendant also made statements to other people. Those statements that he made, those witnesses who testified to those statements, never recanted as to what the defendant had said. And, moreover, and more importantly, the defendant chose to defend, not on the ground that he never made those statements, either to the police or to these other people, but on the ground that even if his statements were accurate, and even if he participated in a burglary, he was not accountable or responsible for the murder. So, in Salomon, the issue of whether the conventions were true essentially disappeared from the case. Because the defendant said, yeah, they're true, but I'm not guilty nonetheless. Not the situation here. In terms of the appellant mainly relies on the witness, the third-party confessions or statements, which, as he said, were recanted. Now, in what the appellant is saying is that since recantations are generally suspect, therefore, you should ignore the recantation in this case. But that confuses two very separate issues. The subject of whether recantations should be taken seriously normally comes up when a witness testifies at trial against the defendant, then recants, then a post-conviction petition is filed, and the issue is, is the first stage, the second stage, the third stage, whatever. This is a different issue. These are witnesses who are testifying under oath, number one, I didn't tell it to the police, and number two, even if I did say that to police, I only said it because the police threatened me. And all three of them said that, basically. There's also, they were questioned by Detective Howland, also the detective who questioned the defendant, and who I believe there are serious doubts about in other cases. So the jury was faced with the question, do we believe what they're saying when they testify, or do we believe what they said to the police, or do we believe it, and it wasn't true because they were threatened. Those were all big questions. And since they were big questions, the statement admitted of Mickel Ward was not cumulative, because it was different. It was a recorded statement. He couldn't deny that he'd said those things on the tape, because they were on tape, and it was very important. It was the straw that broke the camel's back. It was not harmless beyond a reasonable doubt. It went directly into the state's proof that he, in fact, was the shooter. And by the way, not merely present, but the shooter. Now, in terms of the eyewitnesses, the eyewitnesses were all over the map. The descriptions varied by height. They varied in terms of clothing. They varied in terms of hairstyle. They were tentative. In fact, they were proof of innocence more than anything else. And the one witness who gave a positive identification only gave a tentative identification at the lineup previously, and all the identifications were colluded, as the expert testified on our behalf, by the high media publicity this case got because of the connection with President Obama and so forth. Mr. Ward's picture was all over the Internet, all over Facebook, whatever. So the reliability, even of that last identification, was severely, severely questionable. There was some circumstantial evidence, but circumstantial evidence putting at most my client in the area and not putting him as the shooter. So for all of these reasons, there's no harmless. It's harmful. It's not harmless beyond reasonable doubt. And the appellate court's conclusion, which, as Your Honor pointed out, was based solely on a supplemental brief filed two days before and some limited arguments, the appellate court's conclusion was imminently reasonable. Let me just go backwards the issue, which I think is no longer the case, but I will make these comments on it, the issue of whether there should be no review and videotape cases. Read carefully what the appellant is saying, because the principle that you review de novo a case where there's no live testimony and only either documentary or videotape, the documentary part of that goes back to the 19th century. There is a case in 1911 citing earlier cases for that principle, and it was So what the appellant, if you read his reply very carefully, is saying is those cases are wrong, too, no matter the videotape. You should overrule all those cases, and you should overrule all those cases in a case where it doesn't matter. I am going to interrupt you here, because, again, you have made the argument in your presentation, both by motion and in your briefing, that these issues are not before this court or that they should not be before this court, that the state has conceded there was no error below. And so, therefore, perhaps in another case there could be some discussion of these ideas, this evolving technology and what it means to our evidentiary laws, but you yourself have argued that issue is not here. Your Honor took the words out of my mouth, and I could not agree more. I think the issue is not here and should not be addressed, and we think that the petition should be dismissed as improperly granted. I think Your Honor's prior denial is not dispositive, because you're entitled to hear oral argument before making a final decision on that issue. Briefly, as to the scrupulously honor issue, which is not addressed in oral argument. You've also made the argument that it wasn't addressed in the PLA, that we shouldn't address that either, right? Correct. And I don't think you should or have to, but if you want to, despite my suggestion or argument, the appellate court should be affirmed, because there was no scrupulously honoring of his indications. He invoked three times, once within an hour after being first given Miranda warnings, and he said essentially the same thing. He said, I have nothing more to say about it. I don't want to talk about it. And Detective Howard knew what was happening. This is a canny guy. He says, oh, you want to take a break? In other words, will you say, I'm tired now. I don't want to talk. We'll come back later. Ward never said anything of the sort. He never said, I want to take a break. He never said, I'll talk to you later. But they kept coming back. And the third time they came back, he had been sleeping for almost the entire time between his invocation and them coming back. And they wake him up. After 15 minutes, they start talking to him again. This is not scrupulously honor. He was indicating he didn't want to talk. And Detective Howard and the other detectives would not take no for an answer. They kept talking to him. His statement should be suppressed. And it's not harmless beyond a reasonable doubt. It's harmful. And unless Your Honor has any further questions, I will cede the rest of my time. Thank you very much. Counselor. Thank you, Your Honor. I'd like to just make a few brief points. People versus Salomon. That case was just like that. Just like this case. That was a situation where this court held that a defendant's confession to the police was improperly admitted, but it went on to affirm the conviction on the grounds that that error was harmless. And what the court said about why it was harmless is that that improperly admitted confession was cumulative to other properly admitted evidence. The other distinctions that my friend points out here are simply not relevant distinctions. The relevant point in Salomon is that this court looked at the other evidence, found it to be overwhelming, and compared the content of the improper evidence to the content of properly admitted evidence and found that it was cumulative. Weren't the distinctions recantations, basically, in this case as opposed to some of the other cases? Well, certainly we have recantations here, but again, I think we have to look at are these the types of recantations that a jury would believe. And as I noted here, it's simply implausible that the jury would have believed these recantations. Now, it's true that generally when we talk about recantations, we're talking about a witness recanting trial testimony. Here it's a little different because it's witnesses recanting grand jury testimony. But they were equally under oath in front of the grand jury. They testified before the grand jury that they had, Finner and Tucker in particular, testified before the grand jury that they had not been threatened or made any promises. I believe one of those men said that the detectives treated him with respect. I think we also have to look at the fact that all three of these people, Finner, Tucker, and Randolph, each of their accounts corroborates the other. The appellate court recognized that. And with Finner and Tucker in particular, we have independent corroboration of at least some of what they said in the form of the surveillance videos. I also think here that my friend on the other side seriously downplays the other evidence of guilt here. This is more than just evidence that put the defendant near the scene of the crime. It put the defendant in the front passenger seat of the getaway car when a witness to the shooting testified that the gunman entered the front passenger seat of that car, a car of the same make, model, and color that the defendant's mother owned. And then, of course, as I mentioned, we have the surveillance footage that corroborates and shows the movement of that car and places the defendant in that front passenger seat. There was evidence as well that when the defendant was arrested, he was wearing a blue hooded sweatshirt, which Evans testified was the same shade of blue as the hooded sweatshirt that he saw the gunman wearing. Now, we agree as well that the eyewitness identifications are certainly not, you know, sufficient on their own to uphold the conviction. We don't argue that any of the evidence considered independently is enough to uphold the conviction, but you have to look at the evidence in its totality. And when you look at the fact that we have three other confessions, we have strong circumstantial evidence tying the defendant to the getaway car and tying him to the seat in the getaway car that the gunman entered, we have the identifications themselves, which I would note as well that the five students who described the defendant as looking like the shooter, they made those descriptions when viewing lineups and photo arrays shortly after the shooting. And each one of them, they were honest. They were not trying to mislead the detective. They were honest in the fact that they couldn't say with 100 percent certainty that the defendant was the shooter, but they looked at the defendant and said he looks like the shooter. Independently, they independently reviewed those lineups. So one's identification didn't contaminate another. And so when you look at all that evidence together, it makes a very powerful case that a rational jury would have convicted the defendant even absent the custodial confession and that for that reason, any error in admitting that confession was harmless. For conversation's sake, so that everyone understands the terms of art that we're using, we have some students here and I'm just going to ask you this. Define harmless, how we analyze harmless, and what does that mean? As both the U.S. Supreme Court and this court have explained it, the question is, is it clear beyond a reasonable doubt from the record that a rational jury would have convicted the defendant even absent the error? So in a case like this, we say put the confession to the side. Pretend it had not even been admitted. Let's look at the other evidence. Is it clear beyond a reasonable doubt? Is the evidence overwhelming enough, as the court said in Salomon, that we can say that, yes, it's clear beyond a reasonable doubt that the jury would have convicted him even absent the error? And if that's the case, sending it back for a new trial just does not make sense. And that's what the court's, that's basically what's behind the harmless error rule, is that we're not just looking to correct errors and require new trials if the error had no effect on the outcome. And again, you know, as the court explained in Salomon, what you do in those situations is you look at the other evidence. Was it overwhelming? You compare the content of the improperly admitted evidence to the content of the properly admitted evidence and ask, is it just cumulative? And then you can look at, is there anything else in the record which suggests that this error contributed to the conviction? And here again, I think, as I've explained today, all of these factors point towards a finding of harmlessness here. There are no further questions. Again, we would ask the court to reverse and remand for the appellate court to consider the other issues. Thank you very much. This case, which is agenda number six, number 129, 627, people of the state of Illinois, Mr. McHale, Ward, will be taken under advisement. Thank you both, counsel, for your spirited argument.